May it please the court, counsel. Dan Maloney, Federal Defender's Office, Reno, Nevada, on behalf of Appellant Mr. Motley. To begin, I need to call the court's attention to page 17 of the reply brief that I filed in this case. In the first paragraph of that brief, I make a statement when discussing the court's use of prior contacts with the criminal justice system as a factor the court uses in evaluating reasonable suspicion. I say Agent Ames had no such information. That statement is not correct. It's flat wrong. In the government's response to the motion to suppress, which is at Clerk's Docket Entry 24, Agent Ames filed a police report. In paragraph 2 of that police report, he lists several contacts that Mr. Motley had. Those contacts were related to drug offenses. There is no disposition. They were dismissed. Could you keep your voice up a little bit? I'm having some difficulty hearing you. Yes, Your Honor. But those contacts are there. That information was not testified to during the hearing. It was not relied upon by the district court. It was not relied upon in the government's brief in this case. But the statement is incorrect. It should not be in the brief, and it needs to be correct. Was it in the record before the district court? It is attached to Clerk's Docket Entry 24. The government's response, yes, it is in the record. I missed it. So having said that, this case involves an anonymous, unreliable tip of drug activity by Mr. Motley and a late dog. That's the arguments that we're making in this case. The basis for the anonymous tip in this case is that the name of this person is never provided. This takes it out of the case like Adams v. Williams, where the person had talked with the police officer before. They knew his basis of knowledge. It was immediately verifiable at the scene. So there is nothing about this particular person that gives some indication of reliability to the information that this person provided. The second way that the courts have looked at a possibility of providing some information is whether or not the anonymous tip can provide some information that tends to show that the tipster has inside knowledge, has some knowledge not available to the general public relating to the subject of the tip. In this case, we don't have that sort of information either. In the Alabama v. White case, particular location, particular car, particular person, particular date, and particular destination, which were then confirmed by the police in that case, led them to believe that there was some predictive behavior of that tip, which led them to believe that that tip could be reliable. In this case, the predictive tip, part of the tip. We should be having some sort of noise on the line. Is somebody knocking on the mic? Probably me. I'm sorry? It's probably me. I don't have any idea. Okay. So because of that, the only predictive information in this case was that the person would stay at Harrah's for a few days, would leave, and then would return. Our position is that's not predictive information at all. Well, there was a safe incident, too. The safe incident, I really don't know what to make of that incident. Oh, it's pretty easy. You know, the guy says, I can't get into my safe. Do you have a spare key? And they say, no, but we'll have the staff come up and break into it, take the door off. And if you had, you know, your wife's jewels in there, you would say, fine, have the staff come up and take the door off. If you had illegal drugs in there, then the last thing you'd want to do is to have the people in the hotel open it up and find drugs or contraband in there, so then you break into it yourself. And it's a pretty good indication that there was something illegal. It's not 100 percent, but it's pretty good. Well, you were talking about predictive information. Yeah, and the third part and the part where I think we're discussing now is Florida versus J.L. Then if there is an anonymous tip, there has to be some corroboration of unlawful activity as opposed to just activity. And the breaking into the safe, there could be any number of reasons that the person would not want to wait for maintenance to come up. When's maintenance coming? He may be in a big hurry, or he may want to say, gee, this is my chance to use my Junior Explorer break into the safe kit, or anything of that sort. But the most highly plausible possibility is I've got something in the safe that I don't want people in the hotel to see. This is the most plausible explanation. Otherwise, people just say, look, I don't do my own cleaning of my room. If I have a spill in the room or break a glass or something, I don't sweep it up myself. I call housekeeping. On the other hand, if I have a big spill, if I have a quantity of heroin or some illegal substance and spill it, then I wouldn't call housekeeping. I would go out and, you know, buy a broom or, you know, break into the housekeeper's closet and steal a broom and, you know. I mean, this is indication of somebody who does not want to have whatever is in that safe seen by the staff. And the most likely reason for that is that it's illegal. And, you know, for us, that doesn't corroborate that that was drug activity. There could be anything in there that they don't want to see. Why does it have to be drug activity? Because that was the tip, that there is drug activity. And the other point that we make along those lines is that, obviously, there are people in the room. The courts have looked at cases, motel room cases. They look for things like baking soda. They look for things like scales. They look for things like packaging materials. They look for things like oven mitts because the tip says that he rocks cocaine up in the room. Those are the things that they look for. The people are in the room, and there's no information that there's any of those sorts of things going on. Okay. So let's hum along and say you're right about that or, you know, suspend disbelief on that point. But they didn't stop him because of that. They stopped him because he was committing he was suspected of committing two violations of California traffic laws, the obstructive sign hanging from the rearview mirror and the tinted glass. And I think I probably said it out best in the reply brief. In our opinion, that gets us back to the same place. We have a specific finding of fact in this case that the stop was at 1135, the drug dog doesn't arrive until 1215, that there is a reasonable time period of 15 to 20 minutes for a traffic stop, which tracks with the cases like Illinois v. Cabela, United States v. Place. Any time beyond that 20 minutes is a constitutionally significant event. It needs to be justified by independent reasonable suspicion. That independent reasonable suspicion is the reasonable suspicion of drugs, and that's what we say they don't have in this case. The whole case, when you look at it, they all ---- And what did the district court say to that? Excuse me? What did the district court say to that? The district court relies upon reasonable suspicion of drugs to continue the detention. Okay. What difference do we ---- What do we difference? You ---- The facts you accept, unless they're clearly erroneous, and we aren't arguing that any of these facts, that the break into the safe, the money gambled, we're not arguing any of those facts are clearly erroneous. We're arguing that it was evaluated under the incorrect standard. There is no corroboration of unlawful activity. And when you look at the case as a whole, they talk with errors. Errors ---- The case, it seems to me, if you tell me to disagree, comes down completely to the district court opinion at 1180 to 1181. He's got bullet points, 1, 2, 3, 4, 5, 6, 7, 8 bullet points, and those are the facts that there's no disagreement on. And his ruling is that those facts constitute a basis for reasonable suspicion, and you disagree with that, which is a legal question. Correct, Your Honor. Okay. So all I have to do is read those eight facts and determine whether that constitutes reasonable suspicion. Yes, Your Honor. And also, you have to take into account the other things that were going on. They followed the gentleman for two days. They had a surveillance beeper on his car. There is no information in any of that surveillance that he stopped at any places associated with drugs. That's a fact the court looked to. We don't have that fact in this case. He didn't do that. The DEA didn't stop him. They didn't look to get a warrant. They didn't look to get a stop. The Harris, Harris doesn't have any information that he is dealing large amounts of crack cocaine and using their casino to launder that money, or they would have acted. They have the authority to act. They did not act. No one from the start of this case had sufficient information to act until they told the California Highway Patrol, develop your own bases, because we want to see what's in that car. That's our case. Well, that may be true, but still, if these facts constitute reasonable suspicion, they constitute reasonable suspicion. If they don't, they don't. And our position, I guess, simplifying it, maybe oversimplifying it, is broke into the safe. What was in the safe, we don't know. Gambles large amount of money. When was it, by the way? It doesn't say in the opinion. How long before the arrest did he break into the safe? My best recollection, the arrest is December 5th. The safe incident is November 29th, same year. They broke into the safe? Yeah, so it's roughly a week before. Was there justification for the traffic stop as a result of the traffic violations that the officer saw? The position is that those were also heirs of law. That Officer Mannion testified that he saw the windows, tinted windows were illegal. You're not supposed to have that. He hadn't checked back on the statute. That stop was based on an heir of law. But concededly, Your Honor, at some point during the testimony, they go back and forth a lot, and he says, I don't think they let in enough light for California law. The sticker? Oh, I suppose that's right, and I think you are right. As a matter of law, he was mistaken. Suppose he was mistaken and saw this unit that was hanging from the mirror, and I guess the requirement is that it has to be on the windshield. Suppose he was mistaken but stopped him because he believed that those were violations. If it is a mistake of fact, the courts won't overturn the traffic stop. If it is a mistake of law, they will overturn the traffic stop. So if he thought that just, and there was some testimony, a handicapped placard isn't lawful to hang, if that's why he made the stop, that's an heir of law. It has to obstruct the vision. There is some testimony that it may have, he believed it may have obstructed vision. That's an heir of fact, and that will justify the stop. But, again, we're in the same place because the traffic stop doesn't get them to the drugs, or to the dog. The dog gets them to the drugs. The traffic stop doesn't provide sufficient basis and long enough time. And I see I have about a minute left. So unless the Court has some additional question, I'll save a minute for rebuttal. Okay. Thank you. Good morning. May it please the Court.  Good morning, Counsel. I'd like to correct a statement that defense counsel made that is, the correction is in his favor. Judge Reinhart, you asked this question twice about when the incident occurred with the breaking in of the safe. And defense counsel said November 29th, the week before the traffic stop. My reading of the record, it's on pages 196 and 197. I believe that what Detective Ames was explaining was that November 29th is when the director of security relayed this incident to him. I don't think that there's anything in the record about when that incident with the safe occurred. So to answer your question, the head of security had talked about the amount of money and the significant increase in the amount of money that Mr. Motley had been transacting. The confidential informant had said he stayed at Harris for weeks at a time, but we don't know how far back that goes. And, I mean, the director of security talked about him transacting $700,000 in 2007, $600,000 in 2005, and just under $157,000 in 2004. So I think we can presume, or I think it's probably a reasonable inference that it was sometime during that period. But I don't think that there's anything in the record about exactly when that incident with the safe occurred. Within three or four years? Well, two or three, I think. I mean, the only information that goes to date was about how much money the defendant had transacted in the hotel. So he'd been living in the hotel since at least three or four years before? He had been gambling a lot at the hotel. The confidential informant said that Mr. Motley would stay at the casino for weeks at a time while he was there. He would take delivery of up to 19 ounces of powder cocaine. He would stay at Harris for weeks at a time. While he's at Harris, he's cooking that powder cocaine up into crack cocaine, which then he would sell to middlemen for ultimate distribution. Then he would leave for a few days and then come back and resume his drug business. Now, what Detective Ames said when he called CHP, I mean, that was after Mr. Motley was on I-80 West heading back into California. Detective Ames called CHP and said, we have a defendant in a or we have a suspect or an individual in a gold Jeep Cherokee heading back to California. We believe that there are drugs or drug proceeds in the car. What this isn't about is probable cause, right? If Detective Ames had probable cause that there was contraband in the car, he could have said to CHP, would you stop the car and search it for me, please, right? But that's not what he was asking CHP to do. What he was saying is we have reason to suspect that the defendant is driving back to California with either drugs or drug proceeds in the car. We would like your assistance to either confirm or dispel that reasonable suspicion. But we'd like you to do it in such a way that if it turns out that we're wrong, the defendant isn't tipped off to the fact that the DEA is investigating him. So we'd like you to. How can he not have been tipped off when you do a phony traffic stop, which may be lawful? And then you hold him there while you get a dog to come sniff his car. He's not tipped off? You're looking for drugs? Well, I think at that point he probably was. I think if you look at what CHP did, CHP got the call. Now, Mr. Motley. We didn't handle it exactly in a subtle manner. Yeah. Mr. Motley is on I-80 heading west towards Truckee. Detective Ames is not able to catch up with him. And so he calls CHP and says we'd like your assistance. We have this reasonable suspicion, but we don't want him to know that DEA is on to him. Well, he didn't say reasonable suspicion, did he? No. We don't have probable cause. No. He said we suspect. He said we believe. I mean, he's not going to call up and say, well, we have this suspicion, but it's not reasonable. I mean, I think that there's an inference that if DEA calls Truckee and says very likely that this guy has drugs or drug proceeds in the car, and then what did CHP do? I mean, they were at the CHP Truckee headquarters. The sergeant, Saleri, immediately sends Officer Mannion out to the highway to be on the lookout for the car in case it comes by and in case he's able to effect a stop. Then Sergeant Saleri immediately finds Officer Jacobs, who happens to be in the office that day on a training day. He's not in uniform. He's the officer who has the K-9, who does the K-9 unit, and says to Officer Jacobs, go home right now, get your dog, because there might be a traffic stop. I mean, he doesn't even wait to determine whether there are. I'd like to back up a minute. I would like to back up a minute. How about the legitimacy of the traffic stop? As we explained in our brief, both bases for the traffic stop were legitimate. And what this Court said in Wallace, I believe it's Wallace, was the exact same situation, where the officer respected the tinted windows. The officer stopped a suspect because he believed that his driver's side window was tinted too dark. And he testified at the hearing, the officer testified at the hearing that it was his understanding that all tinting on driver's side windows was illegal. Now, that's not true. This is exactly what Officer Mannion testified. It was his understanding that all aftermarket tinting was illegal, and that's not true. But what this Court said in Wallace is, if the officer also testified, I think it was too dark. And Officer Mannion testified, I couldn't really make out his face. And so the fact that the officer believed that it was too dark gave probable cause, even if, because, in fact, if it is too dark, probable cause to pull him over for the window tinting. Now, the other piece was the placard hanging, the 4-by-10-inch placard, which the defendant had an expert who said that this 10-inch placard hung all the way down to the top of the dashboard so you couldn't see under it, and it's four inches wide, that this is an obstruction under California law. Now, the assumption in the ---- Was it? Yes, yes. Under California law? Under California law. I thought it had to be on the windshield. No, no. And, in fact, that's the distinction that this Court made in United States v. King. United States v. King was about whether having a handicapped parking placard hanging from your rearview mirror was a violation of a local Anchorage, Alaska, city ordinance that precluded a driver from driving with something on the windshield that obstructed their view. And what this Court said in King is, the placard isn't hanging on the windshield. And what this Court said in King specifically is, comparing that to a New York ---- there's a New York statute that says that you can't drive with something in or upon your car that obstructs your view. And what this Court said in King is, so clearly, if a legislature wants to prohibit a placard ---- So people driving with a normal handicapped situation hanging from their mirror are violating California law? Well, they could be if it obstructs their view. And I did say in our brief, we didn't find a specific case dealing specifically with a handicapped parking placard. I was able to find, to the extent the Court deems it relevant, when you get the California ---- when you get the handicapped parking placard. The practical answer is that if you're really a handicapped person with a placard, they don't stop you. But if they think that you're a drug dealer, then they can't stop you. How about a handicapped parking placard? The instructions, when you get the handicapped parking placard, the instructions say that you're supposed to hang it on your rearview mirror while parked and remove it while driving. Now, it doesn't specifically say that you're violating the law. Of course, it would depend on, you know, what state or city that you're in, what ordinance or state statute. But regardless, this was a 4-by-10 placard that hung all the way down. The defendant's own expert witness, you know, acknowledged that you can't see through the thing. I mean, you can move your head. This doesn't get you quite far enough. And I realize you're answering the drug's questions, but assuming the best-case scenario for you in answering that question, let's say they could stop, and it's arguably a violation, and it's arguably a violation to have the windshield tinted somewhat. I mean, you know, but that only gets you halfway through the stop. Yes. And at some point, no matter how slowly he writes that ticket and how long it takes to call the station and how long, you know, he sort of vamps, the district court found that eventually that only a part of the time that he was stopped was attributable to the stop involving the two possible violations. And at that point, he should have or did write a ticket, and the suspect should have been free to go. He kept him there specifically longer to wait for the dog. And that's the period of time you have to account for. Even if we end up agreeing with you that the first part of the stop was okay because of possible violation, what do you do about the second part of the stop? Well, two things. First of all, and I do agree with you. I think you're absolutely right that this doesn't get me, that these two traffic stops don't get me all the way there in light of the court's factual finding about the duration of the stop. Right. And that was an issue of great dispute about when Officer Jacobs arrived, when the stop occurred. But the district judge had, you know, resolved it. And we're not saying that that's clearly erroneous. So we are ‑‑ there was a, you know, under the district court's factual findings, there was 40 minutes before the stop and when Officer Jacobs showed up, and we're not claiming that that's clearly erroneous. The judge, by the way, although the judge did not make this finding that the defendant ‑‑ that the officers were intentionally going too long. What do we get to the question? But the question is, yes, the question is, and really what this comes down to is was there reasonable suspicion to believe that criminal activity was afoot? All right. And I'll ask you the same question I asked your opposing counsel. Isn't it all laid out at the district court opinion at page 1180 at the federal sub with the bullet points? Yes. And that's what we have to decide. Are those eight points or seven points, do they constitute reasonable suspicion? Yes. Okay. And that's exactly it. I mean, that's exactly it. All right. I was saying to my colleagues earlier that, you know, this could make a very interesting final exam question for a criminal procedure class because there's a lot of interesting stuff going on here. But what it all boils down to is if these facts, and they're on page 8 in the excerpt of record, if this adds up to reasonable suspicion ‑‑ You win. If it doesn't, you lose. You don't like to think about it. You know, if they, you know, if it doesn't, then I go back to the reason it took 40 minutes to write out these tickets. I mean, it turns out, you know, the defendant didn't have proof of ‑‑ Okay. Well, now let's talk about whether you win on these eight bullet points. So the key thing here is two things here. First of all, reasonable suspicion, as you know, is a significantly lower standard than probable cause. What it is is are there articulable facts from which, with those articulable facts and the reasonable inferences that can be drawn from them, give a reasonable officer suspicion that criminal activity is afoot. And you look at these things. I would correct the defendant, and I did this in our answering brief, and they came right on back in their reply brief. This is not an anonymous tip. The court has several cases where this court and the Supreme Court about the skepticism with which law enforcement should view anonymous tips because, as Judge Kaczynski said in the earlier case, this, you know, anybody can call the police and say anything about anybody. And the key reason that you should view those with suspicion is that there's no consequences if the person is lying. Right? If police don't know who the person is, they can't be held accountable if they're giving false information. Here it's almost the opposite. I mean, Harris would love to have the guy keep staying and spending hundreds of thousands of dollars. I mean, presumably it's legal activity. I mean, if he's just sort of gambling away a lot of money, that's what Harris is in the business of doing, right? Yes. So for their security to say we think the guy is doing something illegal, they're essentially cutting themselves out of some business. Somebody's questioning Harris. Right. It's described in the district court's opinion as a confidential informant's relative. Yes. So what does that make the person? Well, Detective Ames had a confidential informant. One of that confidential informant's relatives had this information about Mr. Motley. Detective Ames met with, spoke with that individual, his confidential informant's relative. That's how he got to know who this person was. He spoke with that person. He knows who that person is. If that person is lying, that person can be held accountable. And that person relayed information about Mr. Motley that he would take possession of 19 ounces of drugs. Does he know anything about the person other than that he's a relative? I mean, I just found it odd in the district court opinion that it doesn't say that he met with him. It doesn't say any of the things he did. It just says he's a relative of a confidential informant. I'm sorry. It does say that he spoke with him. I mean, Detective Ames did speak with this individual. Well, you'd have to if you had got the tip. Yeah. I mean, it wasn't the confidential informant saying, oh, by the way, my cousin says. I mean, he actually did speak with the person who was relaying this information. Does it say how he spoke with him and under what circumstances? Not in the ñ I don't believe that that came out in the suppression hearing, and I don't believe that that's in the record. Well, you know, normally even the unknown informant you speak with, that's how you get the information from an informant, verbally. I think the point ñ Or orally. The point of specifying that this was the relative of one of Detective Ames' confidential informants is to indicate that this isn't an unknown person. It was ñ this person was not identified. Well, that doesn't give him a plus as far as I'm concerned. Confidential informant's probably not a very good guy. And he's got a relative who may be worse. Who knows what his relatives are? Could be a mother-in-law. How reliable is that? I guess ñ I'm sorry. The point being this person, this individual's identity was not disclosed. And as far as I can understand from the record ñ I mean, I will just say from the record there's no indication that ñ the defendants never asked for the name of the person. The defendants at the suppression hearing didn't ask any questions. I mean, they're really ñ Well, that was pretty smart because it's your burden to show. And it's ñ yes. It's absolutely true that it is our burden. I mean, I will point out, though, that it's one thing to say the government hasn't met its burden. But this wasn't an anonymous person. This was an unidentified person, but it was not an anonymous person. The information that they gave was, you know, was corroborated or at least the information that they got from Harris Security was consistent with the information that they had. The only thing that's strange to me is that Mr. Ames' statement to the officer was, I don't have probable cause, so you better get some basis for a stop other than that. Didn't say I have reasonable suspicion and, therefore, you could stop them on the basis of reasonable suspicion. Well, I think ñ I think it was actually important ñ first of all, there's disputed testimony about whether ñ I mean, Mannion says ñ Officer Mannion says that Detective Ames told him he didn't have probable cause. Officer Solari said they didn't say that. But, of course, he wasn't in the conversation with Mannion. Anyway, my point is that if Detective Ames had had probable cause, Officer Mannion could have just pulled the car over and searched it, right? That's right. So in that case, I think it's important ñ I mean, if Ames told him, no, you can't just pull the car over and search it, you don't have probable cause. But he went further and said, so you better have some other basis for stopping the car, a traffic violation. Actually, Officer ñ Detective Ames testified that the reason that he asked Mannion to develop his own reason for pulling over the car was because they didn't want Mr. Motley to know that the DEA was investigating him. And the district court actually found that in the district court's recitation of what happened. He said Detective Ames asked CHP to come up with their own reason for stopping the car because they wanted to wall out the DEA investigation from Mr. Motley's understanding. I'm way over my time. If you have any other questions, I'm happy to answer them. Thank you. One minute for rebuttal. Two points. You've got a minute and a half. Under United States v. Morales, when the government is relying upon the collective knowledge doctrine to justify the reasonable suspicion, and in this case they are, if they don't relay their basis of knowledge, the facts that they have, and in this case they did not, this court has said they will also treat that as an anonymous tip. So for a separate reason, we disagree about we think this guy is anonymous, but that's a separate and independent reason why this is the anonymous tip analysis under Florida J.L. and not the informant we know something about tip under the other cases. And then I think this is key, and I'm going to take issue with a comment that Justice Kaczynski made. Harris never said unlawful activity. Harris never said illegal activity. Harris is suspicious of Mr. Motley. They're suspicious could be related to gambling activities in that he is gambling large sums of money and receiving telephone calls. The entire case, when you look through those eight bullet points, you keep waiting for someone to say, and this relates to drugs because, and they never say that. Well, it's a little hard to believe that a place that makes its living from gambling would view gambling as being sort of suspicious activity. This is what people come there to do. Yeah, they also come to cheat the system. And if there is any indication... Oh, I see, so you think that Harris was concerned he might be... The casinos are constantly concerned. That's the reason for all those. It's not necessarily we want to help law enforcement. They want to keep their money, and so that's why they're highly, and they are highly regulated. If there's something that's going to jeopardize that gambling license and a large-scale drug dealer gambling large amounts of drug proceeds would jeopardize that gambling license, Harris would act on that. Well, that's exactly right. They're doing it sort of, they're losing a customer, but they're suspicious of this other illegal activity, which they have to report because... And again, the point that I make out of that is that Harris has statutory authority to act if they suspect illegal activity, drug activity. They have every incentive to act. They didn't act because nobody had sufficient information to act on drug activity because the only one who says drug activity is the anonymous informant. Thank you, Your Honor. Okay. We're going to take our recess at this point. We'll be back in a few minutes.
judges: Kozinski, Hug, Reinhardt